UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREAT LAKES INSURANCE SE                        CIVIL ACTION

VERSUS                                          NO: 19-12388

A AND C HOLDINGS, LLC, ET AL.                   SECTION: "A" (5)

## ORDER AND REASONS

The following motions are before the Court: **Motion for Summary Judgment (Rec. Doc. 43)** filed by Great Lakes Insurance SE; **Motion for Partial Summary Judgment (Rec. Doc. 44)** filed by Seabrook Harbor, LLC and Seabrook Marine, LLC; **Motion for Partial Summary Judgment (Rec. Doc. 45)** filed by Seabrook Harbor, LLC and Seabrook Marine, LLC.[1]  All motions are opposed. The motions, submitted for consideration on September 2, 2020 and September 16, 2020, are before the Court on the briefs without oral argument.[2]

---

[1] The motion for summary judgment filed by Seabrook Harbor and the motion for summary judgment filed by Seabrook Marine are completely identical and each of the motions expressly states that the motion is for both entities. In the Court's CM/ECF system, however, one motion designates Seabrook Marine as filer (Rec. Doc. 44) and the other designates Seabrook Harbor as filer (Rec. Doc. 45). And both motions are called motions for "partial" summary judgment although neither motion indicates how the relief sought is only partial. The Court therefore instructed its law clerk to contact counsel for the Seabrook parties to ask whether one of the Seabrook motions might be a duplicate filed in error and whether the "partial" designation might also have been an error. As the Court explains later in this Order and Reasons, counsel for Seabrook clarified that neither circumstance surrounding the motions was done in error.

[2] Requests for oral argument were submitted but the Court is not persuaded that oral argument would be helpful in light of the straight-forward issues presented.

**<u>Background</u>**

Great Lakes Insurance SE ("Great Lakes") initiated this declaratory judgment action against George Ackel and A and C Holdings, LLC, seeking to have the Court determine that Great Lakes does not owe insurance coverage for water damage to Mr. Ackel's vessel, the Voodoo.[3]  Ackel filed a third-party demand against Seabrook Harbor, LLC and Seabrook Marine, LLC seeking to hold these entities liable for the water damage to the Voodoo.[4]  The vessel was docked at Seabrook in New Orleans when the damage occurred and Seabrook had performed repair work on the vessel at some point prior to the damage being noticed. Further, Seabrook had moved the Voodoo to another slip about three months prior to the damage being discovered. Ackel's theory, as pleaded against Seabrook, is that the Voodoo's water damage is attributable to Seabrook's negligence either in the mechanical work previously performed on the vessel or in the manner in which Seabrook relocated the vessel to another slip and/or did not properly secure the vessel during a weather event that occurred after the vessel was relocated. (Rec. Doc. 3, Answer and Third Party Complaint). Ackel has not asserted, at least as part of this litigation, a counterclaim against Great Lakes on the coverage issue.

This matter was scheduled to be tried to the bench on October 26, 2020. (Rec. Doc.

---

[3] The Policy Schedule lists A and C Holdings, LLC as the named assured, and George J. Ackel, Jr. as the vessel's operator. (Rec. Doc. 43-2, Great Lakes Policy at 1). For simplicity, from this point forward the Court will refer to A and C Holdings, LLC and George J. Ackel, Jr. collectively and in the singular as "Ackel."

[4] For simplicity, the Court will refer to Seabrook Harbor, LLC and Seabrook Marine, LLC collectively and in the singular as "Seabrook" when referring to both entities. When the distinction between the two entities is factually or legally significant the Court will refer specifically to one or the other of the entities.

11, Scheduling Order). On September 18, 2020, the Court entered an order cancelling the trial given that the federal courthouse in this district remains closed to the public through the month of October due to the coronavirus pandemic. (Rec. Doc. 69, Order).

Great Lakes now moves for summary judgment on the issue of coverage. Seabrook now moves for summary judgment on Ackel's negligence claims.[5] The parties' contentions are addressed below.

**Discussion**

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505.). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255, 106 S. Ct. 2505). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's

---

[5] Seabrook Marine has pending a counterclaim against Ackel for unpaid invoices for labor and parts provided to the Voodoo. (Rec. Doc. 12, Answer and Counterclaim). Seabrook Marine's counterclaim against Ackel is not at issue in the motions sub judice and it was for this reason that counsel for Seabrook designated the Seabrook motions for summary judgment as "partial." See the discussion in note 1, *supra*.

Further, Great Lakes has pending a third-party claim against Seabrook in order to preserve a subrogation claim should Great Lakes owe coverage for the water damage to the Voodoo. (Rec. Doc. 18, Rule 14(a)(3) Complaint). This claim is not at issue in the motions sub judice and presumably will be moot if Great Lakes' motion for summary judgment as to coverage is granted.

case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993)).

Importantly, no part of this case will be tried to a jury. The Court will sit as the finder of fact on all claims, and therefore will be tasked with resolving any factual disputes. In bench trial cases the district judge has greater discretion to grant summary judgment. *Jones v. United States*, 936 F.3d 318, 323 (5th Cir. 2019). The district judge may "decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* (quoting *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010)).

### 1.    Great Lakes' Motion for Summary Judgment

On June 30, 2018, Ackel boarded the Voodoo while it was moored at Seabrook Harbor and discovered that the lower level stateroom and engine compartment were flooded to a depth of slightly more than three inches above the floor. (Rec. Doc. 57, Opposition at 1). It is now undisputed that the flooding of the vessel and the associated loss occurred when the Voodoo's bilge pumps failed to operate and water accumulated in the vessel's bilges until it overflowed into the lower deck stateroom and engine compartment.[6]

---

[6] To be clear, Ackel now agrees that the Voodoo sustained the water damage at issue because the vessel's bilge pumps failed. As previously noted, when Ackel filed his complaint against Seabrook he proffered several theories for the Voodoo's water damage, all intended

(*Id.* at 5). Ackel reported the damage to Great Lakes but Great Lakes denied the claim—Great Lakes' position is that it does not owe insurance coverage for the water damage to the vessel because poor maintenance, not any covered event, caused the water ingress and resultant damage. Although Ackel now concedes that a policy exclusion forecloses coverage for any damage to the Voodoo's bilge pumps and electrical components, he continues to asseverate that Great Lakes' policy covers the consequential water damage to the lower stateroom's flooring, wall coverings, cabinetry and furnishings, again all of which is attributable to the failure of the bilge pumps.[7]   (Opposition at 7).

---

to lay fault for the damage with Seabrook. Those theories included Seabrook's negligence either in the manner in which its employees had performed mechanical work on the vessel or the manner in which Seabrook relocated the vessel to another slip and/or the manner in which Seabrook's employees secured the vessel during a weather event that occurred after the vessel was relocated. (Rec. Doc. 3, Answer and Third Party Complaint). In response to Seabrook's motions for summary judgment, Ackel produced no evidence whatsoever to create an issue of fact as to any of these theories of negligence. Ackel has no evidence to suggest that the bilge pumps failed because of negligence either in the manner in which Seabrook performed mechanical work on the vessel or the manner in which Seabrook relocated the vessel to another slip and/or the manner in which Seabrook's employees secured the vessel during a weather event that occurred after the vessel was relocated.

[7]  Ackel's concession about coverage for any damage to the bilge pumps and electrical components is not surprising in light of Exclusion "r)" to Coverage A. Even if the losses at issue fall under the Coverage A insuring agreement, the policy does not cover damage to the Voodoo's mechanical and electrical parts unless that damage is caused by "an accidental external event such as collision, impact with a fixed or floating object, grounding, stranding, ingestion of foreign object, lightning strike or fire." (Rec. Doc. 43-2, Great Lakes Policy at 6). The evidence in this case does not suggest that the damage to the Voodoo involved any type of external event so as to trigger coverage for damage to the vessel's mechanical and electrical parts. And although Ackel's complaint against Seabrook includes an allegation about an unspecified weather event that allegedly caused the Voodoo to sustain the damage at issue, Ackel does not dispute that even if some mysterious weather event caused the bilges to accumulate excess water, that water would have been pumped out and no damage would have ensued had the vessel's bilge pumps been working properly. Thus, since no external event, accidental or otherwise, caused any of the damage at issue, Exclusion "r)" forecloses coverage for any damage to the Voodoo's mechanical and electrical parts.

Coverage A of Great Lakes' policy provides coverage for "accidental physical damage" to the Voodoo. (Rec. Doc. 43-2 at 4, Coverage A insuring agreement). The Voodoo certainly sustained physical damage so the question is whether the damage was "accidental" so as to bring that damage within the scope of the Coverage A insuring agreement. The policy includes a lengthy definition section but it does not define "accidental."

The parties agree that the policy is governed by the laws of the State of New York. (Rec. Doc. 43-2 at 16). Under New York law, generally it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage. *Consol. Edison Co. of New York v. Allstate Ins. Co.*, 98 N.Y.2d 208, 218 (N.Y. 2002) (citing *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co.,* 89 N.Y.2d 621, 634 (N.Y. 1997; *Tech. Elec. Corp. v. Am. Home Assur. Co.,* 74 N.Y.2d 66, 73-74 (N.Y. 1989)). Unambiguous provisions of an insurance contract must be given their plain and ordinary meaning. *Antoine v. City of New York*, 868 N.Y.S.2d 688, 690 (N.Y. App. Div. 2008). An insurance contract is unambiguous if the language it uses has a definite and precise meaning, and concerning which there is no reasonable basis for a difference of opinion. *Id.* Ambiguous policy terms must be construed in favor of the insured and against the insurer. *Id.*

The Court is persuaded that the coverage issue, *i.e.*, whether the water damage to the Voodoo falls within the Coverage A insuring agreement, must be resolved in Ackel's favor. Again, Great Lakes' policy does not define "accidental" yet the entire coverage question turns on the interpretation of this term. Under New York law, the term "accidental" in an insurance policy (one that does not expressly define the term) may pertain to an unintentional event, which if it occurs will foreseeably bring on injury, or to an intentional

event which unintentionally or unexpectantly results in damage. *See Christodoulides v. First Unum Life Ins. Co.*, 946 N.Y.S.2d 773, 776 (N.Y. App. Div. 2012) (quoting *Miller v. Continental Ins. Co.*, N.Y.S.2d 565; *Salimbene v. Merchants Mut. Ins. Co.,* 629 N.Y.S.2d 913). And while Great Lakes relies on the result reached in *Great Lakes Reinsurance (UK) PLC v. Fortelni*, 33 F.Supp.3d 204 (E.D.N.Y. 2014), a decision interpreting the same insuring agreement at issue in this matter, the Court notes that the entire discussion regarding "fortuitous" events in that ruling grew out of common ground reached by the parties in that particular case, *id.* at 209 ("***the parties' papers reflect an understanding*** that, in the context of 'all-risk' policies, the term 'accident' is synonymous with 'fortuitous.'") (emphasis added), not out of an *Erie*[8] analysis of state law.

The bottom line is that this Court is persuaded that the term "accidental" in Great Lakes' policy is ambiguous at least insofar as this case is concerned. While one could interpret the term as urged by Great Lakes, it remains that the plain and ordinary meaning of the adjective "accidental" is simply something not done intentionally. The plain and ordinary meaning of the adjective "accidental" does not necessarily involve an "accident," such as a collision or calamity. So one could reasonably interpret the term exactly as Ackel interprets it. The ambiguity presented by this term, which Great Lakes expressly declined to define it its policy, must be interpreted in favor of Ackel. Thus, the coverage question in this case turns on whether Great Lakes has met its burden of proof as to the applicability of a coverage exclusion.

The exclusion to Coverage A that Great Lakes relies upon is Exclusion "b)" which

---

[8] *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

provides:

> Unless specifically agreed by us in writing and additional premium charged the following losses and/or damages (whether incurred directly or indirectly) are not covered by this insuring agreement:
>
> b)      Losses due to wear and tear, gradual deterioration, lack of maintenance, inherent vice, weathering, insects, mould, animal and marine life.

(Rec. Doc. 43-2 at 5, Great Lakes Policy at 3).

The specific aspect of this exclusion that Great Lakes relies upon is lack of maintenance. Great Lakes contends that the bilge pumps failed and the water damage ensued because the bilge pumps were not properly maintained by Ackel.

When Ackel discovered the damage to the Voodoo, Seabrook dispatched one of its employees, Mr. John David, an experienced marine electrician, to check on the vessel to see what was wrong. (Rec. Doc. 45-5, David affidavit ¶ 25). David boarded the vessel and when he inspected the electrical breaker panel he discovered that three breakers for the bilge pump de-watering system had been tripped. (*Id*. ¶ 29). In his affidavit David describes in detail what he discovered in July 2018 with respect to the vessel's three bilge pump systems (the forward bilge pump, the forward midship bilge pump, and the aft bilge pump). Each of those systems has a manual pump and an automatic pump that triggers by a float switch. If the system is working properly, the float switch will power up the appropriate automatic pump when the water gets to a certain point, and the properly-working pump will drain the water out of the bilge(s) thereby avoiding the type of damage that occurred in this case. (*Id*. ¶¶ 46-48). None of the automatic bilge pumps triggered to avoid the damage at issue in this case because each of the associated float switches was either not receiving power, not properly secured, or simply not functional. It is undisputed that bilge pump systems are high maintenance items that are essential to de-watering a vessel and need to be maintained

regularly because they can fail at any time. (*Id.* ¶ 54). David would be an important fact witness at trial but no aspect of David's version of events, as detailed in his affidavit, is in dispute.[9]

J. Kevin Martin, an experienced marine surveyor, conducted a field survey of the Voodoo on behalf of Great Lakes after Ackel reported the water damage. Martin produced a thorough inspection report of the Voodoo and he documented all of the damage with annotated photographs. (Rec. Doc. 43-5, Exhibit 3-A). In his declaration, Martin summarized the findings from his 17 page report, which found that water had accumulated in the bilges in part because the hatch drains were clogged with debris and the cockpit deck hatches did not have the lift handles in place which left open holes in cockpit deck. (Rec. Doc. 43-4, Exhibit 3 ¶ 12). These two conditions caused water intrusion into the hull over time, likely from rain events; the water flooded into the bilges because the hatch drains were clogged with debris and the missing hatch latches allowed the water to drain into the bilge. (*Id.* ¶12 & Exhibit 3-A at 16). This of course explains how and why the excess water was in the bilges. No one has suggested, however, that the excess water would have overwhelmed the bilge pumps if they had been operational and functioned as they were designed to do

---

[9] The manual bilge pumps were likewise not functional when David boarded the vessel but there has been no suggestion that Ackel or anyone else had discovered the excess bilge water and tried to run the manual pumps in order to drain the water. In fact, one would assume that if prior to the damage setting in someone had attempted to turn on the manual pumps to drain the excess bilge water only to discover that they weren't working, then that person would have requested immediate help to rectify the situation. But there is no suggestion that this occurred. Therefore, the damage in this case must have resulted solely from the failure of the automatic pumps which are designed to keep the bilges drained of excess water even if no one checks the water levels and discovers a problem. The fact that the manual pumps were also found to be non-operational is just further evidence of how poorly the vessel's bilge pump de-watering system had been maintained prior to the water damage at issue.

when the water reached a certain level in the bilges.

Martin opines that both the failure of the Voodoo's bilge pump system and the resulting water intrusion, more likely than not resulted from lack of maintenance in keeping the cockpit deck hatch drain and gutter systems clean of debris, and the bilge system regularly inspected.[10]  (*Id*. ¶ 14). According to Martin, bilge systems are complex systems that require frequent inspection and maintenance. (*Id*. ¶ 10). Martin would be an important witness at trial but no aspect of Martin's investigation, as detailed in his thorough report, is in dispute.

Douglas Wager of Wager & Associates, Inc. was retained by Great Lakes to adjust Ackel's claim for the damage to the Voodoo. The letter that Mr. Wager authored to Ackel when denying the claim does an excellent job of summarizing Martin's investigative findings and dovetailing those findings with the Great Lakes' policy and in particular Exclusion "b)." (Rec. Doc. 43-7, Exhibit 4-A). As Wager explained, the water damage to the Voodoo was caused by rain accumulating in the vessel's interior over an extended period of time. Lack of maintenance on the vessel caused the excess water to accumulate in the bilges, and lack of regular inspection and maintenance was the reason that the bilge pumps failed thereby damaging the interior of the vessel. Wager explained that had the bilge pumps been maintained in operational condition, the pumps would have been fully capable of discharging the excess water thereby avoiding any damage to the vessel's interior. (*Id*. at 2).

---

[10]  Martin attributed the lack of maintenance to the vessel owner. (Martin affid. ¶ 14). As discussed in conjunction with Seabrook's motions for summary judgment, Ackel has attempted to lay blame for the lack of maintenance squarely on the shoulders of Seabrook. For purposes of Great Lakes' policy and Exclusion "b)" it is immaterial whether Ackel or Seabrook was at fault for the lack of maintenance.

Wager would be an important witness at trial but no aspect of Wager's testimony, as detailed in his denial letter and affidavit, is in dispute.[11]

The Court is persuaded that Great Lakes' undisputed and uncontradicted evidence establishes that the water damage to the Voodoo resulted from lack of maintenance and general neglect of the vessel. And Ackel does not dispute (nor could he given the lack of evidence on his side) that lack of maintenance caused both the excess water problem in the bilges and the failure of the bilge pumps. Ackel posits, however that while lack of maintenance might have damaged the bilge pumps themselves, the flooring, wall coverings, cabinetry, and furnishings were not damaged by lack of maintenance and that the water damage to those items was not a foreseeable consequence of the failure to maintain the vessel.

Ackel's argument resembles the issue of proximate cause taken from tort law. The Court is persuaded, however, that Ackel's proximate cause argument is foreclosed by the express terms of Great Lakes' policy. The policy's exclusions are prefaced with the statement, which is quoted above, that even damage *indirectly* incurred from one of the excluded bases, such as lack of maintenance, is not covered.

In sum, Great Lakes has met its burden of establishing that the water damage to the Voodoo is not covered pursuant to Exclusion "b)" of its policy. Ackel has identified no triable issue of fact with respect to coverage. Great Lakes is therefore entitled to judgment as a matter of law on the issue of coverage. Great Lakes' motion for summary judgment is

---

[11] The summary judgment record contains no deposition transcripts whatsoever. The Court has no reason to doubt that the witnesses' testimony at trial would have been consistent with their affidavits and correspondence authored by them.

GRANTED.

## 2.   Seabrook's Motion for Partial Summary Judgment

For all of the reasons explained above, the Court arrives at the Seabrook motions for summary judgment having already determined that the damage to the Voodoo was caused by lack of maintenance of the Voodoo generally and particularly of the bilge pump de-watering system. As the Court noted above, Ackel no longer disputes that lack of maintenance damaged the Voodoo. And even if he were inclined to dispute the cause of the damage, he has produced no evidence to create an issue of fact as to any other cause for the water damage at issue.[12]  Thus, at the outset and for the reasons previously explained, Seabrook is entitled to summary judgment on Ackel's negligence claims insofar as they were grounded on the contention that Seabrook failed to properly secure the Voodoo when it relocated it to another slip, that Seabrook failed to properly secure the vessel during a weather event,[13] or that Seabrook was negligent in any manner with respect to prior mechanical work that it performed on the Voodoo.[14]  Ackel has produced no evidence

---

[12]  The Court assumes that Ackel's claim against Seabrook is for all of the damage to the Voodoo, including any damage to the vessel's mechanical and electrical parts that was excluded from coverage under Great Lakes' policy. See note 7, *supra*, discussing Exclusion "r)."

[13]  Ackel has provided no evidentiary support whatsoever regarding any weather event. Further, the marine surveyor who investigated the damage for Great Lakes opined that the water damage to the Voodoo was caused by rain accumulating in the vessel's interior and bilges over an extended period of time. In other words, the water damage to the vessel did not result from an isolated weather event.

[14]  Ackel attached to his opposition a copy of invoices for work that Seabrook performed on the Voodoo in 2017 over a year before the water damage was discovered. One of the invoices (and the associated work order) includes a reference to removal of the latches on the cockpit floor. The latches were supposedly given to Ackel. (Rec. Doc. 53-2, Exhibits B & C). Again, as the Court explained in conjunction with Great Lakes' motion for summary judgment, even if the missing latch covers contributed to water accumulating in the bilges, that water would

whatsoever to create a triable issue of fact as to any of these contentions. Seabrook is entitled to judgment as a matter of law on these negligence claims, and given that these unsupported contentions constitute the entire case that Ackel pleaded against Seabrook, Ackel's suit against Seabrook should end right here.

But in his opposition to Seabrook's motions for summary judgment, Ackel pivots and asserts a wholly new legal theory against Seabrook—a legal theory to account for the fact that it is now clear that lack of proper maintenance caused the damage to the Voodoo. Ackel now contends that Seabrook was responsible for maintaining his vessel. Absent an agreement to the contrary, a vessel's owner would typically be responsible for maintaining his vessel, but Ackel now contends that his relationship with Seabrook was one of bailor/bailee rather than lessor/lessee. Ackel argues that Seabrook received the Voodoo in good condition, and the damage occurred while the vessel was in its possession. According to Ackel, as bailee Seabrook had a legal obligation to preserve and protect the vessel from the damage it sustained.

Generally speaking, a bailment is the delivery of property by one person to another, in trust for the execution of a special object upon or in relation to such property, beneficial to either the bailor or bailee or both. *T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983) (quoting Black's Law Dictionary 129 (5th ed. 1979)). Bailment may govern when a vessel is left in a shipyard's custody for repairs. *Nat'l Liab. & Fire Ins. Co. v. R&R Marine, Inc.*, 756 F.3d 825, 830 (5th Cir. 2014) (citing *Buntin v.*

---

have been harmlessly pumped away if the Voodoo's automatic bilge pumps had been maintained so as to remain functional. See note 7, *supra*. Ackel points to no work orders or invoices *prior to the damage* that involved the bilge pumps.

*Fletchas*, 257 F.2d 512, 513 (5ᵗʰ Cir. 1958)). The bailment relationship imposes a duty of ordinary care upon the bailee. *Id.* (citing *Stegemann v. Miami Beach Boat Slips, Inc.*, 213 F.2d 561, 564 (5ᵗʰ Cir. 1954)). While the burden of proof of negligence is on the bailor, by showing that the vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence. *Id.* The duty then devolves upon the bailee to go forward with the evidence and show affirmatively that he exercised ordinary care. *Id.* (quoting *Stegemann*, 213 F.3d at 564).

 Ignoring that Ackel failed to plead this new bailment theory of liability against Seabrook, the Court has considered Ackel's bailment argument and concludes that the argument is just that—argument without evidentiary support—and fails to defeat summary judgment in favor of Seabrook.

 In its reply memorandum, Seabrook emphasizes that Seabrook Harbor and Seabrook Marine are two separate entities that provide distinctly different services. Seabrook Harbor provides both dry-dock and wet slip vessel storage and docking at the marina. (Rec. Doc. 45-7, Undisputed Material Fact ("UMF") # 1). Seabrook Marine provides repair and renovation services for vessels at the marina; Seabrook Harbor does not provide these services. (UMF # 2, 5). Seabrook Harbor stores over 300 vessels at the marina. (UMF # 3). Neither entity provides maintenance services for vessels stored or docked at the marina. (UMF # 4).

 Neither Seabrook Harbor nor Ackel can produce any writing evincing the terms that governed the Voodoo's sojourn at the Seabrook Harbor marina. Even though Seabrook Harbor had a form rental agreement for its business, for reasons unexplained Ackel never executed one of those agreements and apparently Seabrook never pressed the issue. But contrary to Ackel's position, Seabrook's inability to produce an executed lease document

does not ipso facto raise a presumption that the parties' relationship was one of bailment as opposed to lease. In fact, all of the evidence of record militates against finding such a bailment relationship.

It is undisputed that since June 2016 Ackel paid monthly to dock his vessel in an undesignated wet slip at Seabrook's marina. (UMF # 10).[15] Ackel's own factual allegations support this arrangement.[16] Ackel has produced no evidence to dispute Seabrook's contention that repairs were made to the vessel only at certain discrete times and only when requested by the owner. So even if the Court were to assume that a bailor/bailee relationship existed during those discrete times while repairs or renovations were being performed on the Voodoo at Ackel's request, the entire two years that the Voodoo had been docked at Seabrook leading up to the discovery of the damage was not a bailment. As Seabrook has credibly pointed out, the evidence in this case does not suggest that the Voodoo was in Seabrook's sole custody for the two years between June 2016 (when the vessel arrived at Seabrook Harbor) and June 2018 (when the damage was sustained) being repaired. In fact, no repairs were performed on the vessel after October 2017. And given that no one knows exactly when the damage was sustained because the water accumulation in the bilges occurred over an extended period of time, and given that no one can identify the exact point in time when the failure of the bilge pumps damaged the vessel's interior, Ackel

---

[15] Ackel has not disputed any of the material facts provided in Seabrook's Statement of Undisputed Material Facts.

[16] In his complaint against Seabrook, Ackel described the Voodoo as being "docked" at Seabrook Harbor, (Rec. Doc. 3, Third Party Demand ¶ 3), and that he "rented" a boat slip from Seabrook, (*id.* ¶ 9). In his complaint Ackel complained that Seabrook had moved the Voodoo to another slip that he had not approved. (*Id.* ¶ 10). If a bailment relationship had existed certainly Ackel would have not questioned Seabrook's right to relocate the vessel.

cannot (nor has he attempted to) connect the damage to the Voodoo to any of the discrete times prior to 2017 that a bailment relationship might have plausibly existed during vessel repairs.

Furthermore, it is a questionable proposition that an admiralty bailment arises if the delivery to the bailee is not complete so as to give him exclusive right to possession of the bailed property. *T.N.T. Marine*, 702 F.3d at 588( citing *Continental Ins. Co. v. Washeon Corp.*, 524 F. Supp. 34, 37 (E.D. Mo. 1981)). A bailee's duties are limited when the owner has access to the vessel. *Id.* (citing *Stegemann*, 213 F.2d at 565).

In this case Ackel had his own keys to the vessel the entire time that it was docked at Seabrook and he had unlimited access to his vessel. (UMF # 13). Seabrook only had a key to the vessel because it requires all wet slip vessel owners to leave a spare key for the vessel in case of an emergency. (UMF # 15). While Seabrook does not keep a record of any of the tenant vessels' trips or voyages from the marina, (UMF # 14), Ackel has submitted no evidence to suggest that he was ever without full and unfettered access to the Voodoo while he docked it at Seabrook Harbor. Thus, at best, if a bailment relationship did exist in this case it could only be a limited one. And while Ackel fails to create an issue of fact as to even a limited bailment, if such a relationship did exist, Ackel fails to point to any evidence to suggest that performing maintenance on the bilge pump system would be a part of the ordinary care that the bailee (Seabrook) would be required to exercise during the time periods when requested repairs were being effected. Likewise, Ackel fails to point to any evidence to suggest that the ordinary care that the bailee (Seabrook) would be required to exercise under such a relationship would include regularly boarding the vessel to check the water levels in the bilges for the purpose of possibly running the manual pumps, which

turned out to be non-operational.

Furthermore, Ackel's evidence that the vessel was in good condition when delivered to Seabrook is a marine survey that was conducted when Ackel was purchasing the vessel in 2016. (Rec. Doc. 53-1). Comparing this survey to the one conducted in 2018 by J. Kevin Martin it is clear that the overall condition of the Voodoo suffered during the time that Ackel owned the vessel. Interestingly, the 2016 pre-purchase survey found the bilge pumps to be operational but expressly warned that those pumps were high maintenance items, and that the vessel's de-watering system must be maintained because those systems could fail at any time; the survey expressly rejected any warranty as to longevity on the pumps beyond the date of the survey. (*Id.* at 21-22). The survey expressly recommended that each bilge pump be periodically tested to ensure that the pumps and the float switches were operating as designed. (*Id.* at 22). Thus, at least as to the bilge pump system, the failure of which caused the damage at issue in this case, the survey demonstrates only that the bilge pump system was in "good condition" when it was surveyed in April of 2016 while the vessel was located in Placida, Florida under the name "Ono Ocean." The survey, which warns that this type of system can fail at any time, does not establish that the bilge pumps were operational when Ackel brought the Voodoo to Seabrook Harbor. But again, this issue is moot because Ackel cannot establish that the entirety of the two-year relationship between the Voodoo and Seabrook was one of bailment.

In sum, Seabrook Harbor and Seabrook Marine have met their burden of establishing that they are entitled to judgment as a matter of law on Ackel's claims. Ackel has identified no triable issue of fact with respect to his claims against the Seabrook entities. The motions for summary judgment filed by Seabrook Harbor, LLC and Seabrook Marine,

LLC are GRANTED.

Accordingly;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 43)** filed by Great Lakes Insurance SE is **GRANTED**.

**IT IS FURTHER ORDERED** that the **Motion for Partial Summary Judgment (Rec. Doc. 44)** filed by Seabrook Harbor, LLC and Seabrook Marine, LLC is **GRANTED**.

**IT IS FURTHER ORDERED** that the **Motion for Partial Summary Judgment (Rec. Doc. 45)** filed by Seabrook Harbor, LLC and Seabrook Marine, LLC is **GRANTED**.

**IT IS FURTHERED ORDERED** that if Ackel and Seabrook Marine cannot reach an amicable resolution as to Seabrook Marine's outstanding invoices, Seabrook Marine must move for summary judgment on its counterclaim against Ackel so that this case can be concluded in its entirety by entry of a final judgment inclusive of all claims and all parties. Seabrook Marine must timely file its motion for summary judgment under the Local Rules so as to allow submission to the Court no later than **November 11, 2020**.

September 30, 2020

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE